Keri Avellini, Esq. - 036641998
60 Evergreen Pl., Ste. 502
East Orange, New Jersey  07018
(973) 675-8277
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN A. BAFFICO, individually and as guardian for A.G.B, a minor, ANDREW KENNY and AMY KENNY, individually and as guardians for P.K.K. and D.K.K., minors, JACOB LEWIS and CARA LEWIS, individually and as guardians for C.A.L. and B.J.L., minors, LISSETTE LUGO, individually and as guardian for G.S. and M.S., minors, KELLY MAJOCH and SLAWOMIR MAJOCH, individually and as guardians for I.S.M and N.S.M., minors,  JONATHAN MELLONE and DANIELLE MELLONE, individually and as guardians for A.M. and O.M., minors, DARIN SIROTA, individually and as guardian for L.A.L., a minor, HEATHER WEISS and ANDREW ROCKMAN, individually and as guardians for M.R. and S.R., minors, | DOCKET NO. 2:21-cv-2922 |
| | |
| | **COMPLAINT FOR DECLARTORY RELIEF AND TEMPORARY INJUCTION** |
|      Plaintiffs, | |
| v. | |
| MONTCLAIR PUBLIC SCHOOLS SCHOOL DISTRICT, MONTCLAIR BOARD OF EDUCATION, and DR. JONATHAN C. PONDS, SUPERINTENDENT OF THE MONTCLAIR PUBLIC SCHOOLS SCHOOL DISTRICT, | |
| | |
|      Defendants. | |

Plaintiffs, STEVEN A. BAFFICO, individually and as guardian for A.G.B, a minor, ANDREW KENNY and AMY KENNY, individually and as guardians for P.K.K. and D.K.K., minors, JACOB LEWIS and CARA LEWIS, individually and as guardians for C.A.L. and B.J.L., minors, LISSETTE LUGO, individually and as guardian for G.S. and M.S., minors, KELLY MAJOCH and SLAWOMIR MAJOCH, individually and as guardians for I.S.M and N.S.M., minors, JONATHAN MELLONE and DANIELLE MELLONE, individually and as guardians for A.M. and O.M., minors, DARIN SIROTA, individually and as guardian for L.A.L., a minor, HEATHER WEISS and ANDREW ROCKMAN, individually and as guardians for M.R. and S.R., minors, by way of Complaint against Defendant(s), MONTCLAIR PUBLIC SCHOOLS SCHOOL DISTRICT, MONTCLAIR BOARD OF EDUCATION, AND DR. JONATHAN C. PONDS, SUPERINTENDENT OF THE MONTCLAIR PUBLIC SCHOOLS SCHOOL DISTRICT say:

## **THE PARTIES**

1. Plaintiffs are residents of Montclair, New Jersey whose children attend different schools located in the Montclair School District.

2. Plaintiff Steven A. Baffico, is the father of A.G.B, age 8, who is a third grader at Bradford Elementary School.

3. Virtual learning is not working for A.G.B. in any respect.  A.G.B. has attended Bradford School since Kindergarten, wherein she thoroughly enjoyed and exceled in the experience of attending school, in both the academic and social aspects of child development.  The traditional in-person interaction with teachers, staff and students have been critically important in the advancement and evolution of her education, cognitive, social, human development, and most importantly, in her self-confidence.  Virtual learning has had a terribly negative effect on the above, contributing to a regression in her academics, social skills, self-confidence and sense of self-worth.

4. The impact of extended virtual learning on A.G.B. has been profound.  The bright, enthusiastic young lady who she was in March 2020 is no longer who she is today.  She is depressed and her lack of drive, excitement and zest for learning has diminished significantly, as has her sense of security and confidence in herself and her abilities.  She has retreated into an introverted state, falling behind in her studies, unable to get the in-person assistance and personal attention from teachers and staff which she needs and which she is entitled.  Her social, emotional and educational well-being have been damaged. We continue to see it worsen further with A.G.B. each

day virtual learning is extended and each time a return to in-person learning date is postponed.

5.  Plaintiffs Andrew Kenny and Amy Kenny are the parents of P.K.K., a 6th grader at Buzz Aldrin, and D.K.K., a fifth grader at Northeast School. Plaintiffs are truly concerned about the social and emotional development of their daughters. Plaintiff Andrew Kenny works from home and has witnessed first-hand how little his children are engaging in their classes and how difficult it is for them to find success, as they have no one around them to talk to or share their experiences with.

6.  For example, P.K.K. has not been able to see her friends, and she has been unable to meet the new students in her classes, which makes it very difficult for her to open up with her teachers or participate to her fullest. She has anxiety about the possibility of ever making friends and fitting in, and the idea of not going back at all this year adds to that stress immensely.

7.  D.K.K. is also suffering socially and emotionally. Additionally, she is experiencing anxiety over being forced to decide which middle school she will go to because she is not being allowed to tour any of the schools.

8.  Plaintiffs Jacob Lewis and Cara Lewis are parents of C.A.L., age 8, who is in the second grade at Northeast Elementary School in Montclair, and also B.J.L., age 5, who is attending M.C.P.K. pre-school.

9. C.A.L. was always very excited to go to school. She loved to ride the bus, spend time with her classmates and teachers at school, and come home to share all of her day's activities with her family.

10. C.A.L. has never seen the inside of her 2nd grade classroom.  In fact, she hasn't stepped foot inside of her elementary school in nearly a whole year. Since the Montclair school system shut its doors, C.A.L. has been experiencing heightened anxiety that has manifested into Trichotillomania (hair pulling), sleep disorders, and on overall depression.  She is in weekly therapy to help her manage these awful feelings that she doesn't understand.  It's even more difficult for her to see her brother attend his Pre-k classes every day for a full day with no issues, as well as all of the kids at the private Montclair Kimberly Academy directly across the street. C.A.L.'s latest expression is "I don't care about anything anymore." She is an emotional wreck who is struggling academically and socially, on every level.

11. Plaintiff Lissette Lugo is a parent of G.S., age 9, who is in the 4th grade at a Montclair public school and of M.S., age 7, who is in 2nd grade at the same school.

12. G.S. has been home remote schooling since March 2020. Prior to remote schooling, G. S. was always engaged in school and able to read above his

grade level. His writing was often rewarded by his teachers by being displayed in the classroom. He enjoyed going to school, excited to learn from his teachers and interact with his peers. Since the school closures he has become increasingly frustrated by academics and finds it difficult to focus and engage in learning. He struggles with remote learning and, as a result, his reading and writing performance have suffered. His reading level has fallen and he has even been enrolled in a remediation class for reading by the school, Read 180. His grades in reading and writing have fallen and, as a result, his self-confidence has suffered. Each time the school was scheduled to open for hybrid instruction he was excited to return to school so "the teachers would know I'm smart again." With each 11th hour postponement of schools re-opening, most recently on January 22nd, he has become increasingly withdrawn from school, frustrated with online learning, and convinced that he is "not smart." He also does not understand why other schools in Montclair and neighboring towns are open while his remains closed.

13. M.S. is in 2nd grade and struggling with remote learning as well. He has always had difficultly remaining focused during school but had the benefit of hands-on instruction during kindergarten and 1st grade with teachers that were able to keep him engaged. This has completely fallen apart with

remote schooling. He has little interest in online learning. He misses seeing his teachers in-person and interacting with peers. He feels discouraged by the prolonged school closures and, as a result, makes the least amount of effort necessary to get through his assignments.

14. Plaintiffs Kelly Majoch and Slawomir Majoch are parents of I.S.M., age 9, who is in the fourth grade, and N.S.M., age 6, who is in kindergarten.

15. I.S.M. was always enthusiastic about school and was always deemed by teachers as an excellent student. After a few weeks of virtual school, Plaintiffs saw her interest completely decline. There were also outbursts of anger and other signs of depression. Plaintiffs tried talking to her teachers but the number of hours in front of the computer and the lack of in person teaching was causing more harm than good. On October 31, 2020, in order to avoid further psychological and emotional harm, Plaintiffs pulled her out of public school and started homeschooling.

16. N.M. thrived during his preschool years. He was an intelligent, curious and active child who was ready to dive into Kindergarten. The experience of remote Kindergarten was disappointing to say the least. It was incredibly frustrating for Plaintiffs to watch him try to meet a new teacher and classmates through a screen, and within a short time he had little interest in "interacting" this way. He would regularly walk away from the screen and

close his computer. Plaintiffs decided to unenroll N.M. because the remote environment completely failed to support the academic and social emotional learning for a 5-year-old.

17. Although unenrolling their children was the best option for their family it is causing severe strains on their personal lives. Both Plaintiffs are self-employed and had to significantly reduce our working hours in order to provide adequate education to our children.

18. Plaintiff Jonathan Mellone and Danielle Mellone are the parents of A.M., age 7, who is in the 1st grade at Northeast Elementary School and of O.M. age 11, who is in the 6th grade at Buzz Aldrin Middle School.

19. A.M.  has suffered greatly due to the school closures.  In late March 2020, A.M began refusing to participate in school due to heightened levels of anxiety caused by school closures and remote learning. As a 1st grade student, she has not had any social interactions with her peers or teachers. Her social and emotional growth has been stunted. A.M.  has regressed with respect to everything and continues to struggle and now suffers from emotional outbursts and often cries during remote learning classes. We have sought counseling from the Northeast counselor but it has not helped.

20. O.M. has missed out on the educational and emotional achievements of actually graduating elementary school in the 2019/2020 school year.  O.M.

is presently in his first year of middle school.  He has not had any social interactions with his peers or teachers. His social and emotional growth as a middle schooler does not exist, at a time when he should be gaining independence, he is relegated to his room to participate in zoom class.

21. Darin Sirota is the mother of L.A.L, age 6, a kindergarten student who has been assigned to the Charles H. Bullock Elementary School.

22. In the summer of 2019. L.A.L was evaluated for an IEP through the Developmental Learning Center of Montclair. The parent's primary concerns involved L.A.L.'s physical limitations including her hand/eye coordination, core strength, balance and sense of body in space.  The secondary concerns which were deeply connected to the physical, involved tactile sensitivities and emotional regulation.  L.A.L. was eligible for an IEP and with that received PT twice a week, OT once a week and was provided an Aid who she shared with the other IEP/504 students in her Pre-K classroom at the Montclair Community Pre-K.

23. When schools closed from March-June 2020, L.A.L.'s teachers made an attempt at virtual learning, which included a daily zoom morning meeting, emailed lists of activities and a class Facebook page. At times she would engage with virtual learning for five-minute stretches, but most often would not have the ability to focus for longer than that (developmentally

appropriate for her age).  Her virtual PT was very challenging, regularly resulting in feelings of frustration, defeat, tears, and meltdowns.

Upon finding out that school would continue to be fully remote in September, her parents reached out to Tom Santagato, head of special services, and Dr. Ponds explaining that virtual PT did not work for their child and requested that she receive outdoor in-person PT. His response was that they planned to meet all the IEP requirements "virtually," and that they would discuss outdoor as an option and follow up.  There was never a follow-up.

24. Due to virtual learning not being a reasonable substitute for L.A.L., her parents had no choice but to pull her from the MPS.  This came at a great unexpected financial burden to their family.  When unenrolling from the MPS, L.A.L.'s parents sent an email to the following: Dr. Ponds, Thomas Santiago (head of special services) and Nami Kuwabara, Principal of CHB, requesting that due to the unprecedented circumstances that L.A.L. continue to be eligible for PT/OT provided by the MPS, and that upon returning to the district (when schools open to full-time in person), that she continue to be eligible for these services until her original scheduled re-evaluation date of April 2023. They never received a response to either request.

25. Heather Weiss and Andrew Rockman have two children enrolled in Montclair public schools; M. R. age 12, who is in the seventh grade at Renaissance Middle School, and S. R. age 8, who is in the second grade at Bradford Elementary School.

26. M.R. is a special education student with an Individual Education Plan. M.R. has an ADHD diagnosis and underlying health condition which requires life-long medication.

27. As of May 2020, M. R. has been refusing to attend virtual school. His anxiety over the school closures and remote learning has increased dramatically since then. His CST case manager, Ms. Tracey Belsky, had recommended meeting weekly with a school counselor upon our urging and concern. Since September 2020 M.R. has been meeting with this counselor, but it has not eased his anxiety nor stress levels. These last few months M.R. began nervously pulling his hair out. M.R. is being denied his full benefit of special education programs and related services from his IEP. Prior to March 2020 and virtual learning, M.R. loved school and was a straight A student on the honor role. Now he has lost all interest in learning. He suffers from severe headaches daily and extreme eye fatigue. Since he wears glasses, his eyes are extremely sensitive to the computer blue light. Being on a computer for 5 hours daily is proving detrimental to his health.

28. S.R. at 7 years old never had any "screen" time prior to March 2020. She was just learning to read when school went virtual. She loved in-person school, her friends, her teachers, the entire experience had her excited each day for 1st grade. Now after virtual learning has gone on for over 325 days, S.R., now in the 2nd grade, is disinterested in school, unengaged, irritable, hostile, and sad. She suffers from daily headaches and eye fatigue from staring at a screen for more than 4 hours at just 8 years old. She tells me daily that virtual learning makes her "sad." She is behind in spelling and math. Even with the support of a hired tutor, S.R. is struggling to keep up. As a young learner, she is missing vital social interactions with her peers and teachers. She has become withdrawn and is now awkward in social situations. Prior to March 2020, S.R. was an outgoing, confident child. Her social and emotional growth has been stunted.

29. The Montclair Public Schools School District ("MPS" or "District") is a school district in the State of New Jersey that serves the residents of Montclair, New Jersey. MPS provides public education for students from Pre-K though twelfth grade.

30. The Montclair Board of Education ("BOE") is the governing body of the with responsibility for developing policy to ensure the proper care,

management and control of District affairs. The Board consists of seven members who are appointed by the mayor.

31. In addition to setting policy, the Board hires the superintendent; approves staff hirings, transfers, resignations, terminations, and leaves of absence; approves expenditures; approves educational programs (curriculum); and otherwise ensures that the facilities and equipment are available to support learning and teaching in the District. The Board also approves the budget for the School District.

32. The stated mission of the District and the BOE is "to creating a culture of learning and continuous improvement that provides every child with a high quality, creative, innovative and challenging education, through a magnet system of integrated schools in which every school represents a strong, diverse and vibrant community of learners."

33. Dr. Jonathan C. Ponds ("Superintendent") is the Superintendent of the District. As the District's Superintendent, Dr. Ponds is the chief executive officer for the MPS. He is responsible for the effective operation of the District; for the general administration of all instructional, business or other operations of the District; and for advising and making recommendations to the Board with respect to such activities. He is responsible for enforcing all provisions of law and all rules and regulations relating to the management

of the schools within the District. Dr. Ponds is the individual who is ultimately responsible for closing all of the schools in the District since the beginning of the COVID-19 pandemic.

## **NATURE OF ACTION**

34. With the onset of the COVID-19 pandemic, Defendants have effectively put the interests of the children they serve dead last. With their arbitrary rules that fly in the face of the recommendations of experts across different disciplines, the children of the District have been deprived of their right to an education. Sadly, there has been no one to speak for our children over the last twelve months as they silently suffered with remote learning. This lawsuit seeks to remedy the situation on their behalf.

35. This Action is brought pursuant to 42 U.S.C. § 1983, on the grounds that Defendants have violated Plaintiffs' constitutionally and federally protected rights, including specifically: (1) the right to substantive due process (U.S. Const. amend. XIV); (2) the right to equal protection, free from arbitrary treatment by the State (U.S. Const. amend. XIV); (3) the right to equal and meaningful access to education, free from arbitrary state action resulting in a disparate impact on those with disabilities (Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq.; Title II of the Americans with

Disabilities Act of 1990, 42 U.S.C. § 12131, et seq.; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq.)).

36. With the school year still operating remotely almost a year after the District schools were closed, time is of the essence. The Court should not hesitate to secure Plaintiffs' fundamental rights in securing a basic minimum education for their children are preserved and protected from Defendants' arbitrary actions.

## JURISDICTION & VENUE

37. Jurisdiction is proper pursuant to 42 U.S.C. § 1983 as it related to Defendants' violation of Plaintiffs' constitutional rights to due process and equal protection as per the Fourteenth Amendment to the United States Constitution.

38. Further, federal question jurisdiction exists under 28 U.S.C. § 1331 and 1343.

39. The court has the authority to award the relief requested by Plaintiffs as per 28 U.SC. §§ 2291; 1343 (a) and 42 U.S.C. § 1983.

40. Attorneys' fees and costs may also be awarded as per 42 U.S.C. § 1988.

41. Supplemental jurisdiction exists over Plaintiff's State Law Claims pursuant to 28 U.S.C. § 1367.

42. The events complained of herein took place within the jurisdiction of the United States District Court for the District of New Jersey.

## **STATEMENT OF CLAIMS AGAINST DEFENDANTS**

43. On July 17, 2020, Defendants advised that they were offering an all-remote and in-person options for their students. It was noted that only 7% of the people surveyed chose the all-remote option.

44. On July 31, 2020, the school advised that it was still committed to providing 00% remote option, as well as a hybrid model, and that they were exploring outdoor learning and examining all classrooms to ensure they meet ventilation requirements.

45. On August 8, 2020, Defendants announced that they were planning to offer both morning and afternoon in-person sessions for all K-2 students, four dates a week for 2.5 hours a day.

46. On August 13, 2020 the Superintendent held a "Town Meeting" that was closed to public comment, wherein he announced that the school year will begin fully remote.

47. On August 21, 2020, Defendants announced that they were working on short-term and long-term solutions for the ventilation.

48. On August 28, 2020, Defendants announced that the District has completed its survey of the air ventilation systems and that students and staff would return on November 1, 2020.

49. On October 9, 2020, the District announced that special education students will return to in-person learning on October 15, 2020.

50. On October 16, 2020, Defendants announced that, "Due to feedback we've received about our early November start," the in-person start dates were pushed back to November 9, 2020, for pre-K to grade 5, and approximately two weeks later for Grades 6 through 12.

51. On October 30, 2020, Defendants announced that as a result of one confirmed case at a school (where no students were), hybrid learning for the entire district was pushed back to November 15, 2020 for pre-K to grade 5, and to November 30, 2020 for grades 6 through 12.

52. On November 11, 2020, Defendants cancelled hybrid learning but does not advise as to why, only to state that it is unsafe to enter the buildings.

53. On November 13, 2020, Defendants advise that it will re-evaluate hybrid plan on December 1st, based on relevant infection trends and expert guidance.

54. On November 20, 2020, Defendants reiterate that the plan to move to hybrid learning is paused.

55. On December 4, 2020, the Superintendent states that pre-K to grade 5 and special needs will begin on January 25, 2021, and all other were to begin on

February 8, 2021, and that teachers would return to school on January 19th, to prepare for the return.

56. On January 22, 2021 the Superintendent cancels in-person learning for 1/25, saying that he does not have enough staffing.

57. To date, Defendants have not opened up any of the schools in the District for in-person learning.

58. The relevant scientific studies show that COVID-19 is not a risk amongst school-aged children.

59. Science supports school reopening full-time five days a week.

60. School-based transmission is minimal relative to non-school-based transmission and must be contextualized relative to community spread.

61. The COVID-19 School Dashboard, put into place by data scientists and superintendents at over 5,000 schools, comprising over four million students and 1.3 million staff members, gathers information on new COVID-19 cases as broken down by key variables including school type, age of children, PPE usage, density of region, etc. When looking at New Jersey elementary school data, we can see that as of early December 2020, for staff who are teaching in public elementary school remotely, the infection rate is 0.30%. For staff teaching in schools at 50% capacity, it is

0.32%. For staff who are teaching at 90% or more capacity, it is 0.26%.

(*See* https://covidschooldashboard.com).

62. The infection rate in elementary school staff teaching remotely is actually 15% higher than for staff teaching full-time in person. In all cases, it is significantly lower than the rate of infection in the matched surrounding community samples (e.g., 4.8%, 4.2%, 4.1%). In communities that have in-person schooling, the overall infection rate is not higher than that of communities with remote schooling. This suggests that not only is re-opening elementary schools full-time not exacerbating spread of COVID-19 to the teachers, but also the larger community. (*See* https://covidschool dashboard.com).

63. Children ten and under are unlikely to be infected with COVID-19, relative to adults. If they are infected, they are unlikely to face severe complications from COVID-19. (*See* https://www.cureus.com/articles/35775-prevalence-of-asymptomatic-sars-cov-2-infection-in-children-and-adults-in-marion-county-indiana).

64. In a community sample of children, very few children under ten years of age tested positive for COVID-19, either symptomatically or asymptomatically, i.e., one case, out of 119 confirmed cases. This is now

the third such community study to document either no cases or a single case of COVID-19 in children under ten. (*See* https://pubmed.ncbi. nlm.nih.gov/32289214).

65. Even in a symptomatic sample, the rate of infection for children ages five to nine is 0.25%, far lower than adult infection which was 98.3%. (*See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7147903/).

66. When children do get COVID-19, the rate of hospitalization is .008 %. (*See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/pediatric-hcp.html).

67. Despite initial concerns that children would asymptomatically spread COVID-19, the most recent research does not support elementary-aged children as super-spreaders or highly infectious. It is extremely difficult to obtain data on asymptomatic children, who are infrequently tested, but a community-based sample in the US found that asymptomatic children do not seem to be spreading the virus. (*See* https://www.cdc.gov/coronavirus /2019-ncov/hcp/pediatric-hcp.html*).

68. Even in symptomatic cases, children transmit the virus at far lower rates than adults. (*See* https://www.nytimes.com/2020/08/14/health/older-children-and-the-coronavirus-a-new-wrinkle-in-the-debate.html).

69. Both globally and locally, elementary schools have safely reopened, even in the context of high community spread.

70. Local private and parochial schools have been in school for five days a week since the beginning of the school year, with no major outbreaks despite being in school full-time. This lack of outbreaks has held even in areas with high community spread, and even in schools in which social distancing occurs at less than the recommended six feet. (*See* https://tucson.com/news/local/despite-covid-19-cases-surge-virus-spread-in-tucson-schools-remains-low/article.*)*

71. The American Academy of Pediatrics ("AAP") recommends that learning take place while the students are physically present in school.

72. The AAP noted the health benefits that would otherwise be lost, such as child development, social and emotional skills, reliable nutrition, physical, speech and mental health therapy, as well as opportunities for physical activity. (*See* https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/*)*.

73. The AAP also explained that lengthy time away from school and associated interruption of supportive services often results in isolation, making it difficult for schools to identify and address important learning deficits as well as child and adolescent physical or sexual abuse, substance use, depression, and suicidal ideation.

74. Furthermore, it is widely accepted that special education students are particularly harmed by remote learning.

75. Under federal law, students with disabilities are guaranteed a Free Appropriate Public Education (FAPE), as incorporated through the IDEA ACT 34 C.F.R. § 300.101, and Title III of the Americans with Disabilities Act of 1990 ("ADA"), § 504 of the Rehabilitation Act of 1973.

76. Plaintiffs and other parents in the district have expressed their distraught concern with remote learning in the District. They have reported that their children received none, or nearly none, of the individualized and specialized instruction guaranteed by law when schools closed in March 2020. The District has made zero provisions for delivering these federally mandated services to special education children, despite the federal funding the state received that was conditioned upon providing these services. Accordingly, children with disabilities were especially harmed by Defendants' actions.

77. Many individualized education programs (IEPs) simply cannot be implemented in a virtual-learning environment. For example, many IEPs require individualized instruction, such as a one-on-one aide. Failure to comply with a child's IEP can have grave consequences, such as regression.

78. While not unique to students with disabilities, socialization in schools is critical for special needs children.

79. The Center for Disease Control ("CDC") recommends that all students return to school for in-person learning.

80. The CDC reported that the lack of in-person educational options disproportionately harms low-income and minority children and those living with disabilities. These students are far less likely to have access to private instruction and care and far more likely to rely on key school-supported resources like food programs, special education services, counseling, and after-school programs to meet basic developmental needs. (*See* https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/schools.html).

## **COUNT ONE**

### **42 U.S.C. § 1983**
### **Violation of Due Process under the Fourteenth Amendment**

81. Plaintiffs hereby incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

82. The Due Process Clause of the Fourteenth Amendment provides that no State shall deprive any person of life, liberty, or property, without due process of law. U.S. Const.14 amend XIV.

83. In particular, the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997). Plaintiffs and their children have a fundamental right to a basic, minimum education.

84. Access to a foundational level of literacy provided through public education has an extensive historical legacy and is so central to our political and social system as to be "implicit in the concept of ordered liberty." *Id*.

85. The Due Process Clause has also been read to recognize that certain interests are so substantial that no process is enough to allow the government to restrict them, at least absent a compelling state interest. *Id*. at 719-21.

86. The Constitution provides a fundamental right to a basic minimum education. *Gary B. v. Whitmer*, 957 F.3d 616 (6th Cir. 2020), *vacated en banc without decision*, 958 F.3d 1216 (6th Cir. 2020).

87. Defendants have deprived Plaintiffs and their children of this fundamental right in violation of the Fourteenth Amendment to the U.S. Constitution, by effectively denying children a basic minimum education and their fundamental right to literacy.

88. The United States Constitution entitles Plaintiffs to be free from any burden to a fundamental right unless the infringement is narrowly tailored to serve a compelling state interest.

89. Defendants lack any compelling, or even rational, interest for burdening Plaintiffs' children of their fundamental right to a basic minimum education.

90. The weight of the evidence shows that children's transmission and infection rates cannot justify school closures. Defendants further ignore that the evidence of mortality risk and severe adverse health outcome risk to children from COVID-19 disease is virtually non-existent.

91. Risk to teachers may be managed just as risk to other essential workers is managed in New Jersey, by offering choices and providing protection. The challenges posed by the situation pale in comparison to the harm being inflicted on Plaintiffs' families through the deprivations of their constitutional rights.

92. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from shutting down the schools.

93. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive

relief invalidating and restraining enforcement of the Defendants' Order to shut down the schools.

## **COUNT TWO**

**42 U.S.C. § 1983**
**Violation of the Equal Protection Clause under the Fourteenth Amendment**
**Arbitrary School Closures**

94. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

95. The Equal Protection Clause prohibits governmental classifications that affect some groups of citizens differently than others. *Engquist v. Or. Dept. of Agric.,* 553 U.S. 591, 601 (2008). The touchstone of this analysis is whether a state creates disparity between classes of individuals whose situations are arguably indistinguishable. *Ross v. Moffitt,* 417 U.S. 600, 609 (1974).

96. In addition to the pivotal role of education in sustaining our political and cultural heritage, denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause which is the abolition of barriers which present unreasonable obstacles to advancement on the basis of individual merit.

97. Paradoxically, by depriving the children of any disfavored group of an education, we foreclose the means by which that group might raise the level of esteem in which it is held by the majority.

98. Defendants' shutdown of public schools violates Plaintiffs' and their children's right to equal protection.

99. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their and or their children's constitutional rights unless Defendants are enjoined from shutting down public schools.

100.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Defendants' Orders and any associated guidance documents.

## COUNT THREE

### 42 U.S.C. § 1983
### Violation of Federal Disability Rights Statutes; Failure to Provide Appropriate and Equal Educational to Disabled Students

101.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

102.    Federal law provides all disabled children in New Jersey the right to a free appropriate public education, individualized education plans conferring

educational benefit, appropriate identification and evaluation, and the right to be free from discrimination on the basis of any disability, including through the exclusion from or deprivation of equal access to the educational opportunities. *See* 20 U.S.C. § 1400, et seq. (Individuals with Disabilities Education Act ("IDEA")); 42 U.S.C.A. § 12131, et seq., (Title II of the Americans with Disabilities Act of 1990 ("ADA")); 29 U.S.C. § 794, et seq., (Section 504 of the Rehabilitation Act of 1973).

103.    Defendants' arbitrarily imposed restrictions on the reopening of schools, including the forced closure all schools in the District and the imposition of online learning, deprives Plaintiffs' children of these rights, which are secured by the above-cited federal laws.

104.    Defendants acted knowingly, recklessly, and with deliberate indifference to the rights of Plaintiffs by forcibly denying disabled students with specialized instruction and related services commensurate with the schools' obligations under federal law, as well as from providing disabled students equal access to education as required by federal law.

105.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm in the form of the deprivation of educational opportunities, related services, and other educational and non-discrimination rights

secured by federal law, unless Defendants are enjoined from implementing and enforcing the school closure.

106.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the state orders and any associated guidance.

## COUNT FOUR

### Deprivation of Thorough and Efficient System
### of Free Public Schools – N.J.S. 10:6-2 & N.J. Constitution, Art. 8, § IV ¶

107.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

108.    N.J. Constitution, Art. 8, § IV, provides for the Maintenance and Support of thorough and efficient system of free public schools.

109.    Here, the Defendants have failed in their obligation to provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all children.

110.    Distance learning does not satisfy the Defendants' obligation to provide Plaintiffs and those similarly situated their constitutional right to an adequate education.

111.     Plaintiffs have no adequate remedy at law and will suffer continuous, serious and irreparable harm to their state constitutional rights unless Defendants are enjoined from implementing and enforcing their broad prohibitions on in-person education and the Defendants are enjoined from providing distance learning while all the surrounding communities are providing in school learning.

112.     Pursuant to N.J.S. 10:6-2, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Defendants' Orders and any associated guidance documents.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully ask this Court to grant Plaintiffs the following relief:

1. A declaratory judgment that the Defendants shutting down of all in-person learning is unconstitutional, and in violation of the Individuals with Disabilities Education Act (20 U.S.C. § 1400, et seq.); Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12131, et seq.); and/or Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794, et seq.); and

2. Temporary, preliminary, and permanent injunctive relief enjoining Defendants from further denying all in-person learning;

3. Temporary, preliminary, and permanent injunctive relief enjoining the shutdown of all in–person learning;

4. An order requiring that Defendants issue new guidance reinstating in-person instruction for at least five full days per week in all schools without delay; and

5. An award of Plaintiffs' reasonable attorney fees, costs, and expenses under applicable state and or federal law; and

6. Any other such further relief to which Plaintiffs or which the Court determines to be just and proper.


Dated:  February 18, 2021                    *Keri Avellini, Esq.*

Keri Avellini, Esq.
60 Evergreen Pl., Ste. 502
East Orange, New Jersey  07018
(973) 675-8277
keri@goldsteinlaw.com
Attorneys for Plaintiffs

**STATEMENT PER LOCAL RULE 10.1**

Heather Weiss and Andrew Rockman

21 Nassau Road

Montclair, NJ 07043


Lissette Lugo

339 Grove Street

Montclair, NJ 07042


Jonathan Mellone and Danielle Mellone

236 Christopher Street

Montclair, NJ 07043


Darin Sirota

71 Gates Avenue

Montclair NJ 07042


Steven A. Baffico

273 Upper Mountain Avenue

Montclair, NJ 07043


Andrew Kenny and Amy Kenny

29 Dodd Street

Montclair, NJ 07042

Kelly Majoch and Slawomir Majoch

274 Grove Street

Montclair, NJ 07042

Cara Lewis and Jacob Lewis

217 Orange Rd

Montclair NJ 07042

Montclair Public Schools School District, Montclair Board Of Education, And Dr. Jonathan C. Ponds, Superintendent Of The Montclair Public Schools School District

22 Valley Road

Montclair, NJ 07042